(C.D. 4728)

A. N. DERINGER, INC. *v.* UNITED STATES

Court No. 72-2-00281

(Decided January 12, 1978)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Barbara Allen Babcock,* Assistant Attorney General (*John J. Mahon,* trial attorney), for the defendant.

FORD, Judge: Plaintiff instituted this action in an effort to obtain more favorable tariff treatment of certain importations of asbestos mixed with caustic calcined magnesite (magnesium oxide), referred to as part A, and epsom salts (magnesium sulfate), referred to as part B. The merchandise was classified under item 518.51, Tariff Schedules of the United States, as modified by T.D. 68–9, as articles not specially provided for of asbestos and consequently was assessed with duty at the rate of 6% ad valorem or 5% ad valorem, depending upon the date of entry.

The importer contends the merchandise is entitled to entry free of duty under item 518.11, Tariff Schedules of the United States, which provides for various forms of asbestos. Alternatively, it is contended if not free of duty it is dutiable at 0.15¢ per pound or 0.1¢ per pound, depending upon the date of entry, under item 518.44, Tariff Schedules of the United States, as modified by T.D. 68–9, as other articles in part of asbestos and hydraulic cement.

The pertinent statutory provisions provide as follows:

Subpart F. – Asbestos and Asbestos Products

| | | |
|---|---|---|
| 518. 11 | Asbestos, not manufactured, asbestos crudes, fibers, and stucco, and asbestos sand and refuse containing not more than 15 percent by weight of foreign matter_____ | Free |
| | * * * * * | * * |
| | Articles in part of asbestos and hydraulic cement: | |
| | * * * * * | * * |
| 518. 44 | Other_____ | 0.15¢ or 0.1¢ per lb. [depending upon date of entry] |
| | * * * * * | * * |

518. 51 Articles not specially provided for, of
 asbestos _____ 6% or 5% ad
 val. [depend-
 ing upon date
 of entry]

The record consists of the testimony of three witnesses called on behalf of plaintiff and four on behalf of defendant. In addition, plaintiff introduced 13 exhibits and defendant offered two exhibits.

The asbestos involved in the imported merchandise was produced by Carey-Canadian Mines, Ltd., hereinafter referred to as Carey-Canadian, by mining and crushing, after which the fibers were separated by a process called aspiration and then screened according to size. Asbestos is sold and priced according to the length of the fibers. The longest fibers are either crude No. 1 or crude No. 2 and are the most expensive. The shorter fibers which are graded under the specifications of the Quebec Asbestos Mining Association range from grades 3 through 7. The asbestos used in the imported product was grade 7 which Carey-Canadian designated as 7M90. This grade is known as "shorts" rather than crudes and might also be considered as asbestos sand and refuse. The calcined magnesite and the magnesium sulfate were purchased by Carey-Canadian for use with the imported merchandise.

Universal Fire-Bar, Inc., the United States purchaser, set the specifications for the merchandise involved. This company also designs and builds machinery such as automatic water dispensers, foam generators, pumps, and pole guns with external atomization nozzles which allow the product to be sprayed on a steel surface for use as fireproofing. The purpose is to prevent the steel from losing its structural strength resulting from a fire. The imported product has no use in its dry state. It must be combined with a foaming agent and water before spraying. The imported product is not used where it would be exposed to the elements such as rain.

Defendant's exhibit A, a copy of ASTM publication C 219–66, entitled *Standard Definitions of Terms Relating to Hydraulic Cement,* defines the term hydraulic cement as "a cement that is capable of setting and hardening under water due to interaction of water and the constituents of the cement." Witnesses Sztuke, Sporn, Seward, Pollock, Libel and Redeker all agreed with the foregoing definition.

The term "set" in the definition was generally agreed by the witnesses to mean the ability of the materials to assume a shape, while the term "hardness" means the ability to resist change or distortion under pressure or force. The test for setting requires the use of a needle such as a "Westvaco." This is applied to the surface of the material and when the needle no longer leaves an impression, the material is considered set. Hardening, on the other hand, is tested

in a compression machine which determines the amount of force necessary to break or fracture the material. Hydraulic cement must have both of these capabilities.

Plaintiff's exhibit 5, a laboratory report, indicates the samples were submerged in water for 68 hours (tests 2 and 4) and the product in test 2 remained spongy and plastic. Test 4 of said exhibit indicates a certain amount of granulation when the surface of the sample is rubbed. Notwithstanding the pliability, witness Sztuke considered the imported merchandise to be a borderline hydraulic cement since it "sets under water."

Plaintiff's witness Libel described various tests he conducted on portland cement and on samples of combinations of caustic calcined magnesite and epsom salts and he concluded that both were hydraulic cement.

Tests performed by Mr. Sporn, branch chief at the New York Customs Laboratory, and defendant's witness Redeker, western regional manager for Industrial Magnesia Corp., on samples of the imported mechandise or the same mixture indicated the samples that were allowed to set and harden in the air became hard and rocklike, while those that were immersed in water immediately after forming a patty did not harden, were easily abraded or remained in a puttylike consistency. In their opinion the imported merchandise was not a hydraulic cement. Mr. Redeker testified that he was a technical adviser for the committee of the ASTM which put out the specifications for the ingredients used in oxysulfate and oxychloride cements. Defendant's exhibit B, which is ASTM designation C 376–58 and entitled *Standard Definitions of Terms Relating to Magnesium Oxychloride and Magnesium Oxysulfate Cements*, was identified by the witness. The imported merchandise is an oxysulfate cement. According to Mr. Redeker, magnesium oxychloride cement and oxysulfate cement are used for fireproofing and other uses with binders of asbestos and other material. They are not water resistant.

Hydraulic cement, according to the witness, is a cement which when mixed with water will set and harden under water. Neither oxysulfate nor oxychloride cements are hydraulic cements because they will not suitably set or harden under water. Caustic calcined magnesite, plus epsom salts and water, would not result in a hydraulic cement.

The witness further testified that other cements which are not hydraulic are gypsum cements, plaster of paris and Keene's cement. The most common hydraulic cement according to witnesses Redeker and Pollock is portland cement, others being portland-pozzolan cement, slag cement, portland blast-furnace slag cement and oil well cement. Magnesium oxysulfate cement is not water resistant and cannot be used in asbestos cement, pipe or products intended to

carry water in cesspools, in the ground, or where water or excessive moisture would be a factor.

The merchandise involved, imported in 63-pound bags, consists of 50 pounds of chrysotile asbestos fibers, grade 7M90 (79% by weight), 7 pounds of part A, caustic calcined magnesite (11% by weight) and 6 pounds of part B, epsom salts (9% by weight). The addition of parts A and B were as binding agents. The mixture of the three components was accomplished during the shipment where the natural movement of the bags caused the various components to mix. The use of the imported mixture, after being combined with a water and foaming agent, is to spray it on internal steel to prevent its losing structural strength as the result of a fire.

Plaintiff's contention, notwithstanding the mixture with parts A and B, is that the imported merchandise is asbestos unmanufactured. This position is based upon the principle that an *eo nomine* designation without limitation or contrary legislative intent, judicial decision, or administrative practice, and without proof of commercial designation, includes all forms of the article. See *Nootka Packing Co.* v. *United States*, 22 CCPA 464, T.D. 47464 (1935); *Crosse & Blackwell Co.* v. *United States*, 36 CCPA 33, C.A.D. 393 (1948); *T. M. Duche & Sons, Inc.* v. *United States*, 44 CCPA 60, C.A.D. 638 (1957).

The court is well aware of this principle. However, plaintiff's reliance thereon is misplaced. Initially, item 518.11 *supra* does not provide for asbestos without limitation. Said item provides for five forms of asbestos. In addition, the case of *R. F. Lang* v. *United States*, 22 Treas. Dec. 901, Abs. 28666, T.D. 32560 (1912) held that asbestos mixed with paper pulp is not "asbestos, unmanufactured," as provided for in paragraph 501, Tariff Act of 1909, but is a nonenumerated manufactured article under paragraph 480 of said act.

The classification under item 518.51 *supra* carries with it the presumption that it is in chief value of asbestos by virtue of general headnote 9(f)(i). Said headnote defines "of" as used in the Tariff Schedules of the United States to mean wholly or in chief value of the named material. Said classification does not, however, carry with it the presumption that the imported merchandise is asbestos not manufactured or asbestos fibers as contended by plaintiff. On the contrary, the presumption resulting from the classification is to the effect that the imported merchandise is not asbestos unmanufactured or asbestos fibers.

The balance of the claim for free entry under item 518.11 *supra*, as set forth in the complaint filed herein, are asbestos crudes, asbestos fibers, or asbestos shorts, which the record establishes is within the same category as asbestos sand and refuse. Since there has been no attempt by either party to establish a commercial designation, the common meaning of the terms are considered controlling.

It is interesting to note the following information contained in the Summaries of Trade and Tariff Information (1969), Schedule 5, Volume 1, page 160:

> Commercial asbestos is divided into: (1) asbestos crudes, (2) milled asbestos fibers, and (3) asbestos sand and refuse. "Crudes" is a trade term applied to fibers of spinning grade, measuring three-eights of an inch or longer, that are hand cobbed (cleaned of waste material with a hammer) without being passed through a mill for fiberizing. * * *

> Unmanufactured asbestos is marketed by groups rather than as a single product. Groups of asbestos are principally governed by the length of the fiber. Each length has different characteristics and thus has different applications. Longer fibers command higher prices, and prices are progressively lower for shorter grades, although openness, tensile strength, absorption, and other qualities of the fibers are also taken into consideration.

> There is no standard uniform group classification of asbestos in commerce, and the various producing companies and countries adopt their own groupings. The specifications of the Quebec Asbestos Mining Association, whose grades are determined by mechanical sieving (using the Quebec Testing Machine), are widely accepted in the United States. According to the Quebec Asbestos Mining Association, the crudes and spinning fibers comprise group 1, 2, and 3. Group 4 is designated as shingle fiber; group 5, paper fiber; group 6, waste, stucco or plaster; and group 7, refuse or shorts.

Additionally, the Tariff Classification Study (1960), Schedule 5, part 1, at page 30 refers to the limitations imposed on asbestos sand and refuse as follows:

> In item 518.11 an effort has been made to clarify without change of scope the existing language of paragraph 1616. The qualification "containing not more than 15 percent by weight of foreign matter" is intended to apply only to asbestos sand and refuse and the rewritten provision makes this clear.

Since the record establishes the asbestos is grade 7M90 it is apparent from the foregoing that it could not fall within the categories of asbestos crudes or asbestos fibers.

The last claim under item 518.11 *supra* is also clearly eliminated due to the limitation of "15 percent by weight of foreign matter." As indicated *supra* the involved merchandise contains 20 percent by weight of matter other than asbestos.

The alternative claim of plaintiff under item 518.44 *supra* as an article in part of asbestos and hydraulic cement has commanded most of the record testimony and exhibits. The Tariff Classification Study *supra*, page 30, contains the following information regarding plaintiff's alternative claim:

> The language "in part of asbestos and hydraulic cement" reduces to simple terms the actual meaning of the language "in part of

asbestos, if containing hydraulic cement or hydraulic cement and other material". The "in part of" concept in this provision has been retained as it is not likely to produce anomalous classification results. Any product which contains a commercially significant quantity of asbestos and hydraulic cement is appropriately classified within this provision. In practice, goods in this classification generally do not have less than 10 percent by weight of asbestos.

The Summaries of Trade and Tariff Information *supra*, page 173, contains the following information on articles of asbestos and hydraulic cement:

Portland cement and asbestos fibers are used in combination in a great variety of building materials to produce products having weather and fire resistant properties. In a wet state, this material can be molded into almost any desired shape. When dry, it is rigid, strong, and durable. The ratio of asbestos fibers to cement in such products varies from 15 to 25 percent, depending on the length and class of the fibers used and the product being made. Chrysotile asbestos is the principal fiber used in making asbestos cement products. Crocidolite is sometimes used, but in small amounts because of its low strength; amosite fiber is rarely, if ever, used for such purposes. A product which contains a commercially significant quantity of "asbestos and hydraulic cement" is "in part" of such materials and unless more specifically provided for elsewhere in the TSUS is covered by this summary.

Asbestos cement products are particularly useful in industrial buildings and private housing. Principal products made from asbestos cement are shingles, roofing, siding, flat and corrugated sheets, wallboard, and pipes. Asbestos cement pipes are manufactured for use in the construction of sewage and water systems.

Based upon the foregoing and the record as made, the issue with respect to this claim is whether parts A and B are hydraulic cement. The record establishes that the combination of parts A and B results in a magnesium oxysulfate cement. This combination, plaintiff contends, based upon tests performed, results in a hydraulic cement.

The definition of hydraulic cement, as set forth in ASTM designation C 219–66, defendant's exhibit A, reads as follows:

Hydraulic Cement—A cement that is capable of setting and hardening under water due to interaction of water and the constituents of the cement.

It is noted that this ASTM publication defines "Terms Relating to Hydraulic Cement." The single page (page 218) received in evidence lists five different types of hydraulic cement, i.e., natural cement, portland cement, portland blast-furnace slag cement, portland-pozzolan cement, and slag cement. Nowhere in the publication, defendant's exhibit A, is any reference made to magnesium oxysulfate cement. Defendant's exhibit B, ASTM designation C 376–58, relates to magnesium oxysulfate cement and magnesium oxychloride cement.

8

Hydraulic cement, as such, is provided for in item 511.11, Tariff Schedules of the United States. The Tariff Classification Study makes the following observation in schedule 5, part 1, page 19:

> The existing practice with respect to the tariff classification of concrete mixes under paragraph 205(d) apparently is confined to concrete mixes in which the cementing material is hydraulic cement. It would not seem to apply, for example, to a so-called bituminous concrete mix consisting essentially of asphalt or tar and a suitable aggregate. Also appearing in commerce are concrete products which have been made of mixes consisting of mineral aggregates cemented together with resins. Therefore, the final draft provides two rate provisions for concrete mixes, the first of which (item 511.21) covers the hydraulic cement concrete mixes referred to above and the second of which (item 511.25) covers other concrete mixes.

Similarly, caustic calcined magnesite, as such, is encompassed by item 522.64, Tariff Schedules of the United States, and the Summaries of Trade and Tariff Information (1968), Schedule 5, Volume 2, page 149, makes the following statement under the heading: "Description and uses":

> Caustic calcined magnesite is used chiefly in the manufacture of oxychloride and oxysulfate cements.

It is readily apparent the congressional intent in enacting item 518.44 *supra* was not to permit all asbestos combined with cement to be classified thereunder. Congress specifically provided for hydraulic cement. The record and legislative history establish to the satisfaction of the court that magnesium oxysulfate cement, when combined with asbestos, is not subject to classification under said provision.

Accordingly, the claims are overruled and the action is dismissed.

Judgment will be entered accordingly.